**GIN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LINDA MORAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 11 C 8846** |
| **v.** ) | |
| ) | **Magistrate Judge** |
| **MICHAEL J. ASTRUE,** ) | **Maria Valdez** |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Linda Moran's ("Moran" or "Claimant") claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Moran's motion for summary judgment [Doc. No. 13] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

## BACKGROUND

### I. PROCEDURAL HISTORY

Moran originally applied for Disability Insurance Benefits on July 9, 2008, alleging disability since June 1, 2007. (R. 52.) At her hearing, Moran amended her alleged disability onset date to July 23, 2008. (*Id.*) Her application was denied

initially on August 22, 2008 and upon reconsideration on September 24, 2008. (*Id.*) Moran filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on September 24, 2009. (*Id.*) Moran personally appeared and testified at the hearing and was represented by counsel. (*Id.*) A vocational expert also testified. (*Id.*)

On October 6, 2009, the ALJ denied Moran's claim for benefits and found her not disabled under the Social Security Act. (R. 60.) The Social Security Administration Appeals Council denied Moran's request for review (R. 1-3), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A.    Background

Moran was born on December 22, 1970. (R. 121.) She worked as a bus driver from 1992 through 2006, while also working brief stints as a drug store cashier for three months in 2003, on goose patrol at a golf course in the summers of 2002 and 2003, and as a nail gun tester for six months in 2004. (R. 161.) She worked as a customer service representative in 2008. (R. 161.) Moran claims disability due to congenital ichthyosis, obesity, and a history of substance abuse. (R. 54.)

In her application, Moran reported that she has had her skin condition since birth. (R. 174.) Ichthyosis is an autosomal disorder that leads to scaly skin that may be fine or platelike, resembling fish scales, as well as inflexible fingers and toes

caused by taut skin. (R. 227-30.) Moran cannot be in the sun or in a hot environment for long periods, because her skin condition prevents her from sweating and puts her at risk of heat stroke. (R. 173.) She bathes three times per day and applies cream to her entire body, which takes her one and one half hours. (R. 174.) She can do normal indoor household chores, but outdoor chores like yard work can take several days, since she cannot spend long in the sun. (R. 175.) Similarly, chores that put her into contact with household chemicals also take much longer. (R. 175.) Moran reported that walking can cause the skin on her feet to split open, particularly when it's hot. (R. 178.) The skin on her hands may also split open, which is painful, leads to bleeding, and makes it hard for her to use her hands; for instance, she cannot make a fist. (R. 178.) Moran also reported that she does not socialize with others and attributes this to her low self esteem. (R. 177.) She says that other people look at her like a freak. (R. 180.)

Moran's sister submitted a letter prior to the hearing, stating that ichthyosis has made the claimant's feet split and bleed, making it hard for her to walk. (R. 224.) Moran's hands become stiff and swollen, limiting her dexterity and fine manipulation skills. (*Id.*) She compared the claimant's condition to wearing stiff leather gloves at all times. (*Id.*) She stated that Moran cannot sweat and must take precautions, like bringing a spray bottle full of ice water with her, to avoid heat exhaustion during the summer. (*Id.*) The winter cold brings dry and cracking skin that requires Moran to apply Vaseline to her feet before putting on her shoes. (*Id.*) Moran's sister also noted that the claimant was diagnosed with ADHD as a child

and likely still has it. (*Id.*) She added that Moran must apply cream several times per day and that people react to her by shying away, which is emotionally painful and contributes to her depression. (*Id.*)

Moran's mother also submitted a letter. (R. 225-26.) She said Moran's feet bleed because of deep fissures, her hands are calloused, her skin peels continuously, and she has no insurance. (*Id.*) She said the claimant must apply cream to her entire body two to three times each day. (*Id.*) She said that Moran was diagnosed with ADHD as a ten year old, took Ritalin briefly, then stopped taking it because it kept her awake at night. (*Id.*) Moran tried various other drugs with little success. (*Id.*) She also reported that the claimant is very depressed. (*Id.*)

### B.  **Testimony and Medical Evidence**

#### 1.  *Moran's Testimony*

Moran testified that she is a high school graduate and she currently lives alone in a mobile home. (R. 15-16.) She gets money from her father to pay the monthly lot fee, and also receives $198 in food stamps each month. (R. 15-16.) She has a driver's license, which was recently returned after a suspension for driving without insurance, and otherwise gets around by bike or by public bus. (R. 16.) She makes all her own meals, does her own cleaning and laundry, mows her own lawn, and does her own grocery shopping. (R. 30-31.)  She hardly ever goes out to eat or to the movies. (R. 32.) She needs help with bathing and then with putting lotion on her back afterwards. (R. 30.) She testified that she spends roughly six hours per day putting on lotion. (R. 35.) Without it, her skin gets sore, flaky, and stiff, such that

4

she cannot make a fist or manipulate objects that require the use of fine motor skills. (R. 35-36.) She can pick up pens and pencils, but struggles with paper and paperclips. (R. 36.)

Moran most recently worked at a gas station as a cashier, where she also handled certain cleaning duties, until the entire staff was fired in July of 2008 when the company was sold. (R. 17.) When she had to clean fuel leaks, the fuel would get on her hands and she could not bend her fingers for a week. (R. 17.) Nonetheless, she testified that she would have continued to work there if she had been retained. (R. 17.) Prior to the gas station job, Moran worked as a bus driver; she lost her most recent bus driving job after she tested positive for cocaine. (R. 18.) Again, she testified that she would have stayed at the job if possible. (R. 18.) She also worked temporarily as a nail gun tester and on "goose patrol" at a golf course. (R. 18.) Moran testified that she could still do her previous jobs if given the opportunity, but she did not hear anything back when she applied to gas stations, and when she applied to be a server they told her they do not hire "freaks" like her. (R. 19-20.) She seeks to avoid contact with water at her job, however, because if her hands get too wet or too dry they require lotion, and regular contact with water would require applying lotion dozens of times per day. (R. 35.)

Moran testified that she was born with her skin condition but it has gotten worse in the last few years. (R. 20.) Her feet split open on the sides and blister easily, as do her hands. (R. 20, 26.) Any part of her skin that comes into contact with the sun can crack. (R. 26.) And her entire body is covered with dry, scaly skin,

which constantly itches. (R. 26.) She has seen doctors at the Lake County Health Department, who have written prescriptions for head treatments and lotions, but the prices—$70 and $40 respectively—exceed Moran's budget, and she testified that she cannot afford the doctor visits themselves. (R. 20-21.) She has not been able to get a discount, and indicated that she has received no help in that regard. (R. 21.) Moran testified that the doctors knew nothing about ichthyosis. (R. 21.) She has applied cream, particularly to her scalp, but it does not always help. (R. 27.)

Moran testified that she has other ailments beyond ichthyosis. She takes medication for bipolar disorder, although she has never been diagnosed with it. (R. 23.) She does not believe she has the symptomatic mood swings of bipolar disorder; rather, she believes that her hyperactive, fidgety behavior is attributable to attention deficit hyperactive disorder (ADHD), which she had diagnosed when she was 10 years old. (R. 23.) Moran suffers from stiffness in her joints and occasional shooting pains between her left shoulder and left hip. (R. 27.) Moran also testified that she smokes a half pack of cigarettes per day. (R. 24-25.) She admitted that she spends roughly $15 each week, or more than $60 per month, for cigarettes, and noted that smoking also affects her skin. (R. 25.) She is smoking less than she did in the past and is trying to quit. (R. 25.) Moran suffers from depression and low self esteem, has crying spells four times per week, and gets very little sleep. (R. 28.)

### 2. *Medical Evidence*

Dr. Scott Kale performed a consultative examination in August 2008, and diagnosed Moran with congenital ichthyosis, noting her scaly skin and rough skin

rash, and also diagnosed obesity. (R. 242-43.) Dr. Kale found her to be otherwise stable from a physical and emotional standpoint, with no signs of depression, agitation, irritability, or anxiety. (R. 242-43.) She measured five feet six inches tall and weighed 200 pounds. (R. 242.) Dr. Kale tested her grip strength at 5/5 and found her fine motion to be intact. (R. 243.)

Dr. Barry Free reviewed the examination by Dr. Kale and made an RFC determination, concluding that Moran had no exertional, postural, manipulative, visual, or communicative limitations. (R. 247-48.) He did find one environmental limitation: the claimant must avoid concentrated exposure to extreme heat. (R. 250.) He found no limitation related to exposure to extreme cold. (R. 250.) Dr. Free found the claimant to be partially credible, noting that her allegation and symptomatic complaints were partially substantiated by objective medical evidence. (R. 248.) Dr. Francis Vincent performed a reconsideration of the RFC and affirmed the initial evaluation. (R. 254-55.)

Moran also had an eligibility intake assessment at the Lake County Health Department in March 2009, in which she was diagnosed with a depressive disorder and a Global Assessment of Functioning (GAF) score of 50. (R. 260.) One month later, Lynn Hughes, LICSW, performed a comprehensive assessment and diagnosed the claimant with "major depressive disorder, recurrent, moderate," and a GAF score of 54. (R. 269-70.) Moran's treatment plan included group therapy and medication monitoring so that she would be adjusted to an optimal dosage. (R. 270.) The notes suggest she had a follow up appointment in June 2009, (R. 270), but the

medical evidence does not include any records from appointments on that date or afterwards.

### 3. *Vocational Expert's Testimony*

The vocational expert testified that for a person of Moran's age, education, and work experience, who had no limitations on exertion but had to avoid concentrated exposure to extreme heat, Moran's past work would be available. (R. 40.) If she were limited to medium exertion, all the past work with the exception of her bus driver position—which required lifting up to 100 pounds—would still be available. (R. 41.) If she were further limited to no constant grasping or fine manipulation, and no "complex work," her same past work would still be available. (R. 41.) If she had the added limitations of needing to leave work for five to six hours per day to apply lotion and avoiding extreme cold, however, no work would be available. (R. 42.) Nor would work be available if she were off task for twenty percent of the workday. (R. 43-44.) If she had skin flaking off, this would limit her from jobs that required sterility, such as food preparation or lab work, but the expert testified that otherwise it did not appear to affect her available work. (R. 43.)

### C. <u>ALJ Decision</u>

The ALJ found that Moran had not engaged in substantial gainful activity from her amended initial onset date of July 23, 2008 through her date of last insured of December 31, 2012. (R. 54.) The ALJ also found that Moran had severe impairments from congenital ichthyosis, obesity, and a history of substance abuse. (R. 54.) Moran had also alleged disability due to depression, but the ALJ found that

the depression did not cause more than a minimal limitation in the claimant's basic functioning and was therefore non-severe. (R. 55.) The ALJ stated that none of the impairments, alone or in combination, met or medically equaled any listing of impairments. (R. 56.) In particular, Moran's ichthyosis did not meet the listing requirements because she did not have extensive skin lesions that lasted for at least three months. (R. 56.)

The ALJ next determined that Moran had the RFC to perform work at all levels of exertion, with the limitation that she must avoid concentrated exposure to extreme heat. (R. 57.) The medical record did not indicate any greater limitations, the ALJ stated, and the subjective record did not indicate a complete disability. (R. 58.) The ALJ found that Moran was mostly credible, "with the exception of alleged exertional limitations." (R. 58.) Moran's daily activities were not as limited as one would expect based on her alleged disability: the ALJ noted that she alleged pain and sensitivity to sunlight, but regularly rode her bike and mowed her mother's lawn. (R. 59.) Treatment thus far had been "generally successfully" in controlling her symptoms, dispelling the notion that her impairments were more severe than the RFC indicated. (R. 59.) The ALJ also noted that Moran had stated that she could have done her past relevant work and would have stayed in her jobs if possible. (R. 59.) The ALJ found no record evidence from treating physicians that supported greater limitations, and accorded "some weight" to the opinions of non-treating physicians at the State Disability Determination Services that supported the RFC determination. (R. 59.) The ALJ concluded that there were significant

numbers of jobs in the Chicago metropolitan area that Moran could perform, including her past relevant work as a bus/van driver, cashier, customer service representative, modified grounds keeper, and tester, and thus Moran was not disabled. (R. 59.)

## DISCUSSION

## I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts

10

to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v.*

11

*Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III. ANALYSIS

Moran argues that the ALJ decision was in error because, in determining her RFC, the ALJ: (1) improperly analyzed Moran's credibility, and (2) incorrectly assessed Moran's mental and physical limitations, including hand and foot symptoms, obesity, and mental health.

### A. <u>Credibility</u>

Moran claims that the ALJ erred in finding that her claims of impairment were not credible. An ALJ's credibility determination receives substantial deference on review unless it is patently wrong and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003). The ALJ must give specific reasons for discrediting a claimant's testimony, however, and the reasons must find support in the record and be

"sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski*, 245 F.3d at 887-88.

The ALJ's credibility determination found that Moran's impairments "could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 28.) This boilerplate credibility template has been criticized by the Seventh Circuit as failing to indicate "in a meaningful, reviewable way . . . the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). More troubling still is that the template "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Id.* at 645. Such an inverted approach violates the rule that a claimant's statements about the intensity and persistence of pain or other symptoms cannot be disregarded solely because they are not substantiated by objective medical evidence. *Id.* at 646 (*citing* SSR 96-7p). The claimant's credibility must be factored into the RFC determination, not result from it.

The ALJ's reasons for finding Moran not credible in this case are based on a comparison of the claimant's description of her symptoms and limitations, her activities of daily living, and the medical record. When assessing the credibility of an individual's statements about symptoms and their functional effects, an ALJ

must consider all of the evidence in the case record. *See* SSR 96-7p.[1] "This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." *Id.* at *1.

### 1.    Exertional and Non-Exertional Limitations

The ALJ found that Moran's testimony was "mostly credible, with the exception of the alleged exertional limitations, which are not supported." (R. 58.) Moran argues that she has several non-exertional limitations, which the ALJ failed to discuss or credit and which support a disability finding. Most prominent among these is Moran's alleged need to apply lotion several times per day. In effect, Moran argues that either the ALJ erroneously failed to address the non-exertional limitations or adopted an overly broad definition of "exertional" limitations that improperly included applying lotion, along with fine and gross manipulation, concentration, exposure to chemicals, and exposure to cold temperatures. Either is sufficient grounds for remand.

Initially, we note that Moran overstates the potential impact of the lotion issue on her RFC. She testified that she spends roughly six hours per day putting on lotion. (R. 35.) In her application, she specified that she bathes three times per day, then applies lotion to her entire body, which takes one and a half hours each time. (R. 174.) Taking these statements together, Moran asserted that she requires

---

[1] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency.  20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

roughly two hours, three times per day, to clean herself and apply lotion to her body. But these hours need not all take place during an eight-hour workday. Indeed, Moran stated in her application that she applies lotion before breakfast, (R. 176), and she may reasonably be expected to do the same in the evening. Thus, according to her own statements, she would need to apply lotion once during the middle of the day for roughly two hours. Moran's attorney at the hearing asked the vocational expert whether someone who "would need to leave the work space" to apply lotion for "between five and six hours" each day could find work; the answer, not surprisingly, was no. (R. 42.) Moran's attorney also asked whether someone who would be off task for twenty percent of the workday could find employment; again, the expert answered in the negative. (R. 43-44.) But these hypothetical questions overstate the impairment by conflating five or six hours per *day* with five or six hours per *workday*, as discussed above.

Moran's argument for error still prevails, however, because applying lotion should not be "exertional" for the purposes of the RFC, the ALJ made no mention of the lotion issue in the credibility finding, and yet the RFC does not incorporate any break in the workday for Moran to apply lotion. At a minimum, if Moran required one and a half hours for applying lotion, this would necessitate taking a full hour lunch break plus an additional half hour. Both Moran's sister and her mother reported that she must apply lotion several times per day. (R. 224-26.) The ALJ need not discuss every piece of evidence in the record, but the analysis must offer at least a minimal articulation of the reasoning behind the decision in order to allow

meaningful review. *See Boiles*, 395 F.3d at 425; *Zurawski*, 245 F.3d at 889. The absence of any explanation with regard to Moran's need to apply lotion does not meet this minimum standard. If the ALJ included applying lotion as an "exertional" limitation, which seems an unlikely connotation, then that should have been clarified on the record. Similarly, if the ALJ found that Moran did not require the lotion in order to perform the relevant work, or found that she had viable alternatives to an extended midday break to apply lotion, then that finding must be articulated and supported. But "none of the above" is not an option.

The ALJ similarly omits any discussion of exposure to cold temperatures, which may be problematic for one of two reasons. If exposure to cold is a non-exertional limitation, then Moran's claims are credible, as the ALJ never indicated otherwise. If exposure to cold is an exertional limitation, then Moran's claims would not be credible—but then this finding would conflict with the ALJ's determination that exposure to heat is a limitation of her condition, and begs the question of why the ALJ credited her claims regarding heat but not cold. Perhaps the ALJ simply adopted the opinion of the non-treating physicians, who only included heat exposure as a limitation in the RFC. (R. 250, 254-55.) We need not speculate further. Regardless, the ALJ has failed to offer the "minimal articulation of the reasoning" behind the omission sufficient to allow meaningful review by this Court, *see Boiles*, 395 F.3d at 425, which must be remedied.

On remand, the ALJ must articulate which activities fall under the rubric of "exertional" and "non-exertional," including the application of lotion, exposure to

16

hot and cold temperatures, fine and gross manipulation, and concentration. This must include a determination of whether Moran requires lotion in order to function, and if so, how often it must be applied. Furthermore, the ALJ must indicate why Moran's assertions regarding her non-exertional limitations were credible while her other asserted limitations were not. Finally, the ALJ must indicate how Moran's non-exertional limitations were incorporated into the RFC.

## 2. Use of Medical Evidence and Activities of Daily Living

Moran argues that the ALJ misinterpreted her activities of daily living in finding them inconsistent with her claimed disability. The ALJ found that treatment had been generally successful in controlling Moran's symptoms. (R. 59.) Yet the medical evidence gave no indication that Moran's symptoms had been controlled. Dr. Kale confirmed that she suffered from congenital ichthyosis, noting that her condition was *otherwise* stable. (R. 242-43.) (Emphasis added.) The ALJ did not explain how an ichthyosis diagnosis, without more, showed control over the claimant's symptoms. In addition, according to the ALJ, Moran would not frequently ride her bike or mow her mother's lawn if she truly could not tolerate sunlight. (R. 59.) While Moran did not say how long it took to mow her mother's lawn, she testified that mowing her own lawn took her three minutes. (R. 32.) The ALJ failed to clarify how three minutes outdoors was inconsistent with sensitivity to sunlight. In sum, the ALJ erred by not articulating why Moran's daily activities are inconsistent with her subjective complaints.

Moran also argues that the ALJ improperly relied on the medical evidence to discredit her testimony. It is well settled that the absence of objective medical evidence supporting the subjective complaint is only one factor to be considered in the credibility determination. *Scheck v. Barnhart,* 357 F.3d 697, 703 (7th Cir. 2004). In this case, the ALJ did not rely solely on the medical evidence, however; the decision rested in part on Moran's own description of her daily activities, which the ALJ found to be too extensive to allow for a significant disability. That finding was insufficiently substantiated, as discussed above. On remand, the ALJ must not only remedy the defects in the daily activities findings but also must rely on more than the medical evidence to discredit the claimant's testimony, drawing a logical conclusion based upon all the relevant evidence as applied to the factors listed in SSRs and case law. *See Bjornson*, 671 F.3d at 645.

### 3.    Claimant's Desire to Return to Previous Work

Moran also argues that, in finding her less credible, the ALJ improperly took into account that the claimant would have stayed in her previous jobs if possible. A claimant's ability to hold a job, desire to return to a job, or loss of a job for non-disability-related reasons does not disprove disability; the ALJ may consider it, but must also probe the claimant's capacity before finding that the claimant is capable of the previous work. *Henderson v. Barnhart*, 349 F.3d 434, 435-36 (7th Cir. 2003). A claimant's "mere 'determination' to work, without more, was not a proper basis for undercutting her credibility." *Anderson v. Astrue*, No. 09 C 2399, 2011 WL 5244358, at *2 (N.D. Ill. Nov. 2, 2011) (*citing Bartell v. Cohen,* 445 F.2d 80, 82 (7th

Cir.1971)). The ALJ noted that Moran "even admitted" she could still do her past work, and had lost the jobs for reasons "unrelated to her impairment." (R. 59.) Without more, this would be an improper basis for a credibility determination. But these statements did not stand alone. They came after the ALJ discussed several other factors in making the credibility finding, indicating that Moran's desire to return to her previous work was not the sole basis for finding her less credible. Therefore, this was not reversible error. *See Henderson*, 349 F.3d at 435-36; *Anderson*, 2011 WL 5244358, at *2.

## B.     <u>Mental and Physical Limitations</u>

Moran claims that the ALJ failed to properly consider her obesity. The ALJ identified obesity as one of Moran's severe impairments, (R. 54), but did not discuss it further, except to state that Moran did not meet or equal a listed impairment, (R. 56), and to note that the consultative examiner diagnosed obesity, (R. 58). What Moran fails to explain is how a further discussion of obesity would have changed the ALJ's decision in this case. The non-treating physicians made their RFC assessments with knowledge of Moran's obesity and the ALJ took note of the obesity in making her determination, however, so Moran cannot and does not argue that the ALJ failed to consider it at all. Moran simply wants the obesity to carry greater weight in the ALJ's decision, so to speak. But this is not grounds for reversal or remand. The claimant has not demonstrated that any error by the ALJ would have changed the outcome of the case. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000).

Moran argues that the ALJ erred in determining that she did not have severe depression. The ALJ found no evidence to show that Moran lost adaptive functioning, found that she had "no more than mild limitations" in the major mental function areas—ability to complete routine activities of daily living, social functioning, and concentration or persistence—and concluded that the mental impairment was non-severe. (R. 56.) Moran argues that the ALJ improperly rendered her own independent medical assessment in reaching this conclusion. In 2008, however, Dr. Kale found Moran to be emotionally stable, and the RFC by Dr. Free made no mention of emotional limitations. (R. 242-43, 247-50.) In 2009, on the other hand, Moran was diagnosed with major depressive disorder and GAF scores of 50 and 54. (R. 260, 269-70.)[2] A score of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 34 (4th ed. Text Revision 2000). Scores between 51-60 indicate moderate symptoms or moderate difficulties in social, occupational, or school functioning. *Id.* The record evidence therefore lends some support to Moran's claims of a serious impairment, but also supports the ALJ's conclusion that the mental impairment did not affect her functional capacity. Moran herself testified to feeling depressed, which affected her self esteem and made it hard to sleep, as well

---

[2] The GAF scale is a hypothetical continuum of mental health and illness. Lower scores reflect greater mental illness.

as her belief that she has ADHD. (R. 23, 28.) She has not specified what limitations, if any, this presented to her ability to work. While Moran complains that the ALJ did not mention the GAF scores, the ALJ need not address every piece of evidence in the record. *See Zurawski*, 245 F.3d at 889. The inconsistencies of the GAF scores and the diagnoses, combined with the ALJ's review of several of Moran's mental health assessments, are sufficient to meet the standard for "substantial evidence" that a reasonable mind would accept as adequate to support the ALJ's conclusion. *See Skinner*, 478 F.3d at 841. This finding was not in error.

Finally, Moran argues that the ALJ failed to properly assess her hand and foot limitations. The ALJ took note of Moran's difficulty with fine manipulation and the occasional ripping open of her skin when she used her hands. (R. 58.) The ALJ also acknowledged the swelling, numbness, and rash that affect Moran's feet. (R. 57.) Moran indicated that her skin problems have gotten worse in recent years, (R. 20), and that even picking up paper now causes her difficulty, (R. 36), which clearly affects her ability to hold certain jobs, such as a cashier. Dr. Kale tested her grip strength at 5/5, however, and found her fine motion to be intact. (R. 243.) The ALJ made no mention of whether Moran's hand and foot limitations could reasonably be accepted as consistent with the medical evidence, nor why they were not presented to the vocational expert or factored into Moran's RFC. The ALJ may not simply ignore evidence and cannot discredit testimony simply because there is no objective medical evidence to support it. *See Myles v. Astrue*, 582 F.3d 672, 676-77 (7th Cir. 2009). The ALJ must address Moran's hand and foot limitations on remand.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Linda Moran's motion for summary judgment [Doc. No. 13] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this order.

**SO ORDERED.**                    **ENTERED:**


**DATE:**   <u>January 3, 2013</u>          _____
                                    **HON. MARIA VALDEZ**
                                    **United States Magistrate Judge**